IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CV-206-FL

| | | |
|---|---|---|
| MARISA REVAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HANS J. MILLER, Sheriff, in his | ) | |
| official and individual capacity, | ) | ORDER |
| ONSLOW COUNTY SHERIFF'S | ) | |
| OFFICE, a North Carolina public entity, | ) | |
| and, THE OHIO CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' partial motions to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6). (DE 36, 53). The issues raised have been briefed fully, and in

this posture, are ripe for ruling. For the following reasons, defendants' motions are granted in part

and denied in part.

## STATEMENT OF THE CASE

Plaintiff initiated this action November 20, 2018, and filed the operative amended

complaint February 8, 2019, asserting claims of hostile work environment and retaliation on the

basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, et seq. ("Title VII"), violation of the Equal Protection Clause of the Fourteenth Amendment

to the United States Constitution, pursuant to 42 U.S.C. § 1983, and negligent failure to prevent

civil rights violations, pursuant to 42 U.S.C. § 1986. Plaintiff also brings a claim for unpaid wages

under the North Carolina Wage and Hour Act ("NCWHA").  Plaintiff seeks compensatory and

punitive damages, declaratory relief, pre-judgment and post-judgment interest, attorneys' fees, and

costs.

On November 18, 2019, defendants filed the instant partial motion to dismiss, arguing that

plaintiff's hostile work environment, § 1983, and § 1986 claims should be dismissed for failure to

state a claim upon which relief can be granted.  Plaintiff responded, and defendants replied in

support of the motion.  On January 1, 2020, defendants filed an additional partial motion to dismiss,

seeking dismissal of plaintiff's retaliation claim for failure to state a claim upon which relief can

be granted.  Plaintiff responded in opposition, and defendants replied.  In sum, defendants seek

dismissal of all of plaintiff's claims except her NCWHA claim for unpaid wages.

## STATEMENT OF FACTS

The facts alleged in the operative amended complaint may be summarized as follows.  At

all times relevant to the instant action, defendant Hans J. Miller ("Sheriff Miller") was the duly

elected Sheriff of Onslow County, North Carolina.[1]  (Pl. Am. Compl. (DE 18) ¶ 2).  Defendant

Onslow County Sheriff's Office ("OCSO") is a North Carolina public entity and body corporate.

On or about March 8, 2015, defendant OCSO hired plaintiff as a detention officer, and plaintiff

held this position until her alleged constructive discharge on March 16, 2018.  (Id. ¶¶ 11-12).  At

all times during her employment, plaintiff's direct supervisor was Captain Fred Jefferies ("Captain

Jefferies").  (Id. ¶ 12).  In May 2017, defendant Sheriff Miller assigned plaintiff to video visitation,

where she worked alongside Christine Parrott ("Parrott"), a coworker who suffered from a serious

---

[1]     Defendant Sheriff Miller and defendant Ohio Casualty Insurance Company executed a $25,000 official bond,
binding defendant Ohio Casualty Insurance Company in such amount in the event defendant Sheriff Miller failed to
faithfully perform the duties of his office.  (Pl. Am. Compl. (DE 18) ¶ 5).  By the execution of the bond and adoption
of an insurance plan, defendant Sheriff Miller waived his immunity from civil liability.  (Id. ¶¶ 6-7).  Defendant OCSO
also adopted a plan of insurance and thereby waived its immunity from civil liability.  (Id. ¶¶ 3,7).

2

medical condition. (Id. ¶ 13). Plaintiff's new assignment ensured that the video visitation position would be covered in the event that Parrott took medical leave, and it also allowed plaintiff to attend to her childcare obligations. (Id. ¶ 14-15).

Upon plaintiff's reassignment, Captain Jeffries accused her of manipulating Parrott's situation in order to obtain a more desirable work schedule and allegedly began harassing plaintiff on the basis of sex. (Id. ¶¶ 16-17). For example, in June 2017, Captain Jeffries berated plaintiff for allowing an inmate to receive a glittery greeting card. (Id. ¶ 18). Unaware of a policy banning glittery greeting cards, plaintiff asked her co-worker, Lieutenant Barron, when such policy was enacted. (Id. ¶¶ 18-19). Before Lieutenant Barron could respond, Captain Jefferies "began yelling angrily at Plaintiff, approximate quotes of which are 'what the h*** do you think you're doing?' and 'why the f*** are you asking a junior officer if you have to do something when I just told you to do it?'" (Id. ¶ 19). Plaintiff fled to the restroom to regain her composure, and her ability to work was impaired for the remainder of the day. (Id. ¶ 21).

Then, in July 2017, Captain Jefferies altered plaintiff's time cards, so that she was required to work 86 hours per pay period, instead of the usual 80 hours, which caused plaintiff to lose vacation and sick time. (Id. ¶ 22). When plaintiff approached Captain Jefferies about the alterations, Captain Jefferies shouted, "who runs this jail?" and told her not to tell him how to perform his job. (Id. ¶ 23). Plaintiff attempted to work through her lunch hour to mitigate the lost time, but Captain Jefferies required her to take a lunch break. (Id. ¶ 22). Plaintiff informed Captain Jon Lewis ("Captain Lewis"), the manager of defendant OCSO's time management system, about Captain Jefferies's alterations, and Captain Lewis subsequently restored her original time entries. However, plaintiff's lost vacation and sick time were never restored. (Id. ¶ 24).

From August 2017 to December 2017, Captain Jefferies allegedly threatened to change plaintiff's shift because plaintiff told Captain Jefferies she needed the shift to accommodate her childcare needs. (Id. ¶ 25). For example, on one occasion, plaintiff told Captain Jefferies she needed to take her children to school because their babysitter was sick. In response, Captain Jefferies stated "he did not 'understand why women who have kids don't stay at home,' or something to that effect." (Id.). Then, Captain Jefferies remarked defendant OCSO "had given her an 8:00 a.m. to 5:00 p.m. to accommodate her childcare situation, 'and you can't even do that.'" (Id.).

In September 2017, plaintiff asked Captain Jefferies if she could attend a training conference for detention officers. (Id. ¶ 26). Although other detention officers employed by defendant OCSO were allowed to attend, Captain Jefferies told plaintiff "your place is at home with your kids" and denied her request. (Id.). Plaintiff reported Captain Jefferies statements to Captain Linwood Straughn, the officer in charge of training. (Id.).

In October 2017, Captain Jefferies yelled "What the h*** are you talking about?" to plaintiff in front of visitors at the Onslow County jail. (Id. ¶ 27). In response, plaintiff stated, "I just thought" and Captain Jefferies interrupted, "'that's your problem, you freaking think' or words to the same effect." (Id.). As a result, plaintiff became fearful of Captain Jefferies. (Id.).

On January 5, 2018, a snowstorm closed defendant OCSO for a day, so plaintiff and Parrott asked Major Lou Zimmerman ("Major Zimmerman") if they could work on Saturday instead of using the snow day as a vacation day. (Id. ¶ 28). Overhearing their request, Captain Jefferies "interrupted, 'you're going to take vacation like everyone else,' or words to that effect." (Id.). Major Zimmerman allegedly appeared surprised by Captain Jefferies's remarks, but did not say anything to him. (Id.). Plaintiff and Parrott's request to work on Saturday was approved the

4

following day, and Captain Jefferies refused to speak to them or acknowledge their presence.  (Id. ¶¶ 28-29).

On multiple occasions on January 8, 2019, and January 9, 2019, Captain Jefferies threw papers at plaintiff instead of handing them to her.  (Id. ¶ 32).  Once, the paperwork hit a drink on plaintiff's desk, causing it to spill on her keyboard.  (Id.).  Plaintiff notified Colonel Donnie Worrell ("Colonel Worrell") and Major Zimmerman about the incident.  (Id.).  Also on January 9, 2018, plaintiff discovered that Captain Jefferies allegedly referred to her and Parrott as "f***ing b***es" to other officers and told them plaintiff was manipulating her position.  (Id. ¶ 31).

Plaintiff reported Captain Jefferies's behavior to Major Zimmerman, who suggested that plaintiff should confront Captain Jefferies in Major Zimmerman's presence.  (Id. ¶ 33).  However, plaintiff indicated that she would not be comfortable doing so, and it would make the situation worse.  (Id.).  Therefore, Major Zimmerman spoke to Captain Jefferies about his behavior alone. (Id. ¶ 34).  According to plaintiff, Captain Jefferies's behavior did not change, and he continued to ignore her and Parrott.  (Id.).

In February 2018, Parrott went on medical leave.  (Id. ¶ 35).  Because plaintiff was afraid of being alone with Captain Jefferies, she asked Lieutenant Barron to intervene if Captain Jefferies entered her office.  (Id.).  According to plaintiff, Lieutenant Barron had witnessed Captain Jefferies's behavior around plaintiff and agreed to intervene.  (Id.).  Plaintiff also reported Captain Jefferies's behavior to various officials within the chain of command at defendant OCSO, including Major Tommie Thomas ("Major Thomas"), Colonel Worrell, Major Zimmerman, and Captain Lewis.  (Id. ¶ 36).  Plaintiff specifically informed Major Thomas and Captain Lewis that she was experiencing extreme stress due to Captain Jefferies's behavior.  (Id.).  However, according to plaintiff, nothing was done to curtail Captain's Jefferies's alleged harassment, and no

one provided plaintiff with any documentation on defendant OCSO's policies and procedures regarding sexual harassment. (Id.). Plaintiff also reported Captain Jefferies's alleged harassment to the Onslow County Human Resources Department, and she was told that only defendant OCSO could address the matter. (Id. ¶ 38).

In early March 2018, plaintiff told Major Zimmerman that she could no longer endure Captain Jefferies's alleged harassment and "the failure of [defendant] OCSO to respond to her complaints left her with no alternative but to resign." (Id. ¶ 39). Major Zimmerman did not offer plaintiff a solution, and he did not inform defendant Sheriff Miller of plaintiff's complaints. (Id.). On March 9, 2018, plaintiff left work early "because of illness due to stress and anxiety" resulting from Captain Jefferies's alleged harassment. (Id.).

On March 12, 2018, plaintiff approached defendant Sheriff Miller to tender her resignation and two weeks' notice because of Captain Jefferies's alleged harassment. (Id.). Parrott accompanied plaintiff to this meeting to corroborate plaintiff's account, and Parrott allegedly informed defendant Sheriff Miller that she also wanted to resign but could not, in light of her medical condition, since her health insurance coverage was predicated on her continued employment with defendant OSCO. (Id. ¶ 23). According to plaintiff, defendant Sheriff Miller expressed surprise that plaintiff had not notified him of her complaints previously, and told her that "it would take time for him to fix the situation." (Id. ¶ 42). However, defendant Sheriff Miller also allegedly told plaintiff she should have been able to handle the decision herself. (Id. ¶ 44).

Upon receiving plaintiff's two weeks' notice, Major Zimmerman asked her to move her desk to another floor so that she would not be near Captain Jefferies. (Id. ¶ 45). In response, plaintiff told Major Zimmerman she felt as if she was being punished for reporting Captain Jefferies's alleged harassment. (Id.). Major Zimmerman replied, "'If Captain Jefferies leaves,

how do I know you won't have a problem without whoever comes and takes his place?' or words to that effect." (Id.).

## COURT'S DISCUSSION

A.    Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, " [the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.    Analysis

1.    Timeliness of Motions to Dismiss

As an initial matter, the court addresses plaintiff's argument that defendants' motions to dismiss should be denied as untimely, because defendants filed the instant motions after filing their answer. In support, plaintiff cites Federal Rule of Civil Procedure 12(b), which requires motions asserting a Rule 12(b) defense to be filed "before pleading if a responsive pleading is allowed." Additionally, plaintiff notes that although defendants raised Federal Rule of Civil Procedure 12(b)(6) as an affirmative defense in their answer, they did not file a separate motion to dismiss or an accompanying memorandum at that time, in contravention of Local Civil Rule 7.1(e). See

7

Local Civil Rule 7.1(e) ("[A]ll motions made, other than in a hearing or trial, shall be filed with an accompanying supporting memorandum.").[2]

As defendants note, plaintiff mischaracterizes the requirements under the Federal Rules of Civil Procedure. Rule 12(b) provides that "every defense . . . must be asserted in the responsive pleading if one is required. But a party <u>may</u> assert [a Rule 12(b)(6) defense] by motion." Fed. R. Civ. P. 12(b) (emphasis added). Thus, defendants properly asserted their Rule 12(b)(6) defense in their answer and were not required to file a motion at that time. Since defendants were not required to assert their Rule 12(b)(6) defense in a motion, the accompanying memorandum requirement set forth in Local Rule 7.1(e) is inapplicable. <u>See</u> <u>Williams v. Equity Holding Corp.</u>, 498 F. Supp. 2d 831, 839 (E.D. Va. 2007).

Moreover, although Rule 12(b)(6) motions must be made before pleading, failure to state a claim can be raised as a defense after the pleadings have closed. <u>See</u> Fed R. Civ. P. 12(h)(2)(B) ("Failure to state a claim upon which relief can be granted . . . may be raised by a motion under Rule 12(c)."); Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."). Indeed, the United States Court of Appeals for the Fourth Circuit has construed certain "untimely" Rule 12(b)(6) motions as Rule 12(c) motions. <u>See</u> <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999). Accordingly, the court construes defendants' motions to dismiss as motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). This distinction is without practical significance, however, since Rule 12(b)(6) motions and Rule 12(c) motions are evaluated under

---

[2]      In the alternative, plaintiff argues defendants' motions to dismiss should be construed as motions for summary judgment. Although a court must treat Rule 12(b)(6) motions as motions for summary judgment when "matters outside of the pleadings are presented to and not excluded by the court," Fed. R. Civ. P. 12(d), here neither party references any document outside of the complaint. Thus, the court declines to treat the instant motions as motions for summary judgment.

the same standard of review. See Burbach Broad Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002).

2.      Defendant OSCO

Defendants argue defendant OCSO should be dismissed from this action because it lacks the capacity to be sued. State law determines whether a state governmental agency has the capacity to be sued. Fed. R. Civ. P. 17(b)(3) ("Capacity to sue or be sued is determined ... by the law of the state where the court is located."). In the instant case, there is no North Carolina statute authorizing suits against sheriff's departments. Cf. N.C. Gen. Stat. § 58-76-5 (authorizing suits against sheriffs); N.C. Gen. Stat. § 153A-11 (authorizing suits against counties). This court has repeatedly found that sheriff's departments lack capacity to be sued in North Carolina. See, e.g., Jilani v. Harrison, No. 5:15-CT-3271-FL, 2018 WL 1545584, at *10 (E.D.N.C. Mar. 29, 2018), aff'd, 732 F. App'x 208 (4th Cir. 2018); Dillon v. Mills, No. 4:16-CV-00003-FL, 2016 WL 3102015, at *2 (E.D.N.C. June 2, 2016) (citing Parker v. Bladen County, 583 F. Supp. 2d 736 (E.D.N.C. 2008)) ("District courts in North Carolina have found that sheriff departments do not have capacity to be sued."); McCallister v. Lee, No. 7:13-CV-154-FL, 2014 WL 3700337, at *1 (E.D.N.C. July 24, 2014), aff'd, 585 F. App'x. 56 (4th Cir. 2014) ("Under North Carolina law, [the Onslow County Sheriff's Department] is not an independent legal entity with the capacity to sue and be sued.").

In opposition, plaintiff argues that defendant OCSO waived its incapacity defense in its answer. (See Def. Ans. (DE 19) ¶ 3) ("It is admitted . . . that the Onslow County Sheriff's Department is capable of prosecuting and defendant civil actions."). However, whether an entity has the capacity to be sued is a question of law, unaffected by admissions in defendants' answer. See Fed. R. Civ. P. 17(b)(3) ("Capacity to sue or be sued is determined . . . by the law of the state

where the court is located.") (emphasis added). Accordingly, the court finds that defendant OCSO lacks the capacity to be sued, and all claims against defendant OCSO are dismissed with prejudice.

In the alternative, plaintiff seeks leave to join an additional party in the event defendant OSCO is dismissed from this action. However, where an official capacity claim constitutes a claim against the entity of which an officer is an agent, see Kentucky v. Graham, 473 U.S. 159, 165-66 (1985), and where defendant Sheriff Miller is sued in his official capacity in the instant matter, plaintiff has named the proper defendant, and any attempt by plaintiff to assert her claims against an additional party would be duplicative. Accordingly, such request is denied.

3.      Hostile Work Environment

Plaintiff claims that defendants violated Title VII by creating a hostile work environment on the basis of plaintiff's gender. Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008). To state a hostile work environment claim, "a claimant must demonstrate that the alleged conduct: 1) was unwelcome; 2) resulted because of her gender [ ]; 3) was sufficiently severe or pervasive to alter the conditions of her employment; and 4) was imputable to her employer." Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009).

Defendants concede that plaintiff did not welcome the alleged conduct at issue. Thus, the parties' first point of contention involves the second element, that is, whether the conduct was because of plaintiff's gender. "[A]n employee is harassed or otherwise discriminated against

because of his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination." Ziskie v. Mineta, 547 F.3d 220, 226 (4th Cir. 2008) (internal citations omitted). A plaintiff "may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions, but can succeed only by showing that she is the individual target of open hostility because of her sex." Id. (internal quotations omitted).

Plaintiff argues she is not required to establish but-for causation at the pleadings stage, relying on Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) for the proposition that a plaintiff need not establish a prima facie case of discrimination to survive a motion to dismiss. However, in Swierkiewicz, the Supreme Court was addressing a Title VII discrimination claim under the McDonnell Douglas[3] burden-shifting framework, not a hostile work environment claim. Moreover, "the Supreme Court in Swierkiewicz applied a different pleading standard than that which it now requires under Iqbal and Twombly." McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015). Although Iqbal and Twombly "did not overrule Swierkiewicz's holding that a plaintiff need not plead the evidentiary standard for proving a Title VII claim . . . Twombly and Iqbal did alter the criteria for assessing the sufficiency of a complaint." Id. at 586-87 (emphasis in original). Accordingly, plaintiff's argument is unpersuasive.

Importantly, the Fourth Circuit has applied the "but-for" test while reviewing dismissal of a complaint under Rule 12(b)(6). See Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996). Likewise, this court has applied the "but-for" test at the pleadings stage. See Berry v. S. States Coop., Inc., No. 5:17-CV-635-FL, 2018 WL 4365499, at *2 (E.D.N.C. Sept. 13, 2018). To be sure, plaintiff need not prove at this stage that her gender was the but-for cause of

---

[3]     McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

the alleged conduct; however, she must plausibly allege that her gender was the but-for cause of the alleged conduct.

Here, plaintiff alleges that Captain Jefferies altered plaintiff's timecards so that she had to work more hours than required (Id. ¶ 22), yelled at her in the presence of visitors at the Onslow County jail (Id. ¶ 27), "berated" her for violating a glitter policy, which plaintiff alleges does not exist (Id. ¶ 18), and threw papers at plaintiff on "numerous occasions" (Id. ¶ 32). Moreover, Captain Jefferies allegedly denied plaintiff's request to attend a training session for detention officers, telling her "your place is at home with your kids[,]" although he allowed other detention officers to attend. (Pl. Am. Compl. (DE 18) ¶ 26). On another occasion, Captain Jefferies allegedly stated that he did not "'understand why women who have kids don't stay at home' or something to that effect[,]" and added that defendant OCSO "had given her an 8:00 a.m. to 5:00 p.m. shift to accommodate her childcare situation, 'and you can't even do that.'" (Id ¶ 25). Finally, Captain Jefferies allegedly accused plaintiff of "manipulating" her position to obtain a more desirable work schedule (Id. ¶ 16), threatened to change plaintiff's shift because she told him she needed her current shift to accommodate her childcare needs (Id. ¶ 25), and referred to plaintiff and her female co-worker, Parrott, as "f***ing b****es." (Id. ¶ 31). Construing the facts in the light most favorable to plaintiff, plaintiff has plausibly alleged that her gender was the "but for" cause of Captain Jefferies's alleged conduct.

Defendants argue that Captain Jefferies's alleged treatment of plaintiff was not because of her gender, but rather because of "a perception that Plaintiff engaged in manipulative behavior and bypassed [Captain Jefferies] in the chain of command in order to obtain a more desirable work schedule than her fellow officers." (Def. Mem. (DE 38) at 14). In support, defendants rely on Ziskie, a case where the plaintiff "abused her sick leave in order to retain her old part-time

schedule" while her co-workers were forced to work full weeks, and meticulously record[ed] in her diary every conceivably offensive comment [her co-workers] made and every instance in which they did not help her as much as she thought was appropriate." 547 F.3d at 226-27. While remanding plaintiff's hostile work environment claim on other grounds, the Fourth Circuit noted the difficulty plaintiff would face in establishing on remand that the alleged harassment was because of her sex instead of "personality conflicts" since her "behavior was unlikely to endear [herself] to her colleagues." Id.

While both Ziskie and the instant matter involve a plaintiff seeking changes to her work schedule to accommodate childcare needs, the instant case is instructively distinguishable from Ziskie, where the alleged harasser in Ziskie did not employ gender epithets or make remarks about the propriety of women in the workplace. Indeed, here, defendants' proffered alternative explanation for the alleged harassment is enmeshed with plaintiff's gender, in light of Captain Jefferies's alleged remarks that a woman's place was at home with her child. Considering these remarks, as well as Captain Jefferies's alleged use of a gender epithet, and drawing all reasonable inferences in plaintiff's favor, plaintiff has plausibly alleged that gender animus fueled Captain Jefferies's alleged hostility towards her. See Freeman v. Dal-Tile Corp., 750 F.3d 413, 420-21 (4th Cir. 2014) ("[A] raft of case law establishes that the use of sexually degrading, gender-specific epithets, such as . . . 'b* * * *,' . . . has been consistently held to constitute harassment based upon sex.") (internal citation omitted).

Defendants also argue the phrase "or words to that effect," peppered throughout plaintiff's complaint, casts doubt on the veracity of plaintiff's allegations. However, upon motion to dismiss, the court does not "resolve contests surrounding the facts [or] the merits of a claim." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016). Instead, the court "accept[s] as true all of the

13

factual allegations contained in the complaint." Id. at 212. Thus, notwithstanding plaintiff's lack of precision, the court assumes her allegations are true at this preliminary stage.

Next, the court turns to the third element of a hostile work environment claim, whether the alleged conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment. This element "has both subjective and objective components." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (en banc). In considering whether a working environment is objectively hostile, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

As pertinent here, "a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions." Smith v. First Union Nat. Bank, 202 F.3d 234, 242 (4th Cir. 2000). Indeed, "[a] work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." Id.

Here, plaintiff has adequately alleged that her working conditions were subjectively hostile. She alleges workplace conditions caused her such extreme stress and anxiety that she fled to the restroom on multiple occasions to regain her composure, left work early once, and ultimately quit her job. (Pl. Am. Compl. (DE 18) ¶¶ 21, 27, 36, 40, 46, 48).

Whether plaintiff's work environment was objectively hostile is a closer question. Although plaintiff was not subject to sexual advances, she alleges Captain Jefferies humiliated her, ridiculed her, and made several remarks that demean the status of women. For example, when plaintiff sought permission to attend a training session for detention officers, Captain Jefferies

14

denied her request, stating "your place is at home with your kids."  (Id. ¶ 26).  One month later, in front of visitors at the Onslow County jail, Captain Jefferies allegedly yelled "What the h*ll are you talking about?"  As plaintiff replied, "I just thought . . ." Captain Jefferies interjected "'that's your problem, you freaking think' or words to the same effect."  (Id. ¶ 27).  On another occasion, Captain Jefferies allegedly berated plaintiff for violating a glitter policy that plaintiff claims did not exist.  (Id. ¶ 18).  Finally, Captain Jefferies allegedly referred to plaintiff and her female co-worker as "f***ing b****es."  (Id. ¶ 31).  Although Captain Jefferies allegedly used the gender epithet outside of plaintiff's presence, plaintiff was informed about the incident while she was still employed by defendant OCSO.  (Id.).  Accordingly, Captain Jefferies's alleged use of this gender epithet is relevant to plaintiff's hostile work environment claim.  See Perkins, 936 F.3d at 210 ("[T]he evidence of racially offensive conduct that Perkins heard about second-hand should not be disregarded simply because he did not witness it."); Ziskie, 547 F.3d at 225 ("Even if [plaintiff] did not witness the conduct described therein, it is nonetheless relevant because it could contribute to the evidence offered to show that the workplace environment at the Washington Center was indeed a hostile one.").

Captain Jefferies's position as plaintiff's direct supervisor increases the objective severity of his alleged conduct because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character."  Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015);  see also E.E.O.C. v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 329 (4th Cir. 2010) ("[The] severity of Kessel's conduct was exacerbated by the fact that he was not only [plaintiff's] immediate supervisor but also the sole owner of Fairbrook . . [and] had significant authority over [plaintiff] on a day-to-day basis."); Ziskie, 547 F.3d at 277 ("Severity inquiries in our earlier cases have often involved a disparity in power between the harasser and the victim.").

15

Indeed, some of plaintiff's allegations of discrimination and harassment involve Captain Jefferies wielding his power over plaintiff, such as when he allegedly denied her request to attend training because he thought her place was at home with her kids (Id. ¶ 26), when he allegedly altered her timecards so that she had to work more hours than required (Id. ¶ 22), and when he allegedly threatened to change her shift because she told him she need the current shift to accommodate her childcare needs (Id. ¶ 25).

Regarding frequency, plaintiff alleges approximately eight incidents within a seven-month period. (See id. ¶¶ 18-32). As such, plaintiff's allegations are pervasive. Cf. Perkins v. Int'l Paper Co., 936 F.3d 196, 210 (4th Cir. 2019) (two incidents, eight years apart, and occurring many years before plaintiff quit his job, are not pervasive); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-754 (4th Cir. 1996) (a few incidents "occurring intermittently over a seven-year period, with gaps in between incidents" were not sufficiently pervasive to be actionable). Accordingly, construing the facts in the light most favorable to plaintiff, the court finds plaintiff has plausibly alleged conduct sufficiently severe or pervasive to alter the conditions of her employment.

Finally, the court considers whether Captain Jefferies's alleged conduct is imputable to defendant OSCO. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see Vance v. Ball State Univ., 570 U.S. 421, 450 (2013) (holding that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim).

Here, plaintiff plausibly alleges that Captain Jefferies's conduct is imputable to her employer. (See, e.g., Pl. Am. Compl. (DE) ¶¶ 12, 22 25,26). Although an employer "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided" Boyer-Liberto, 786 F.3d at 278, defendants did not raise the affirmative offense, or even address this element of plaintiff's hostile work environment claim, in the instant motion. Accordingly, the court declines to consider the affirmative defense's applicability.

In sum, plaintiff has plausibly alleged a hostile work environment claim, and defendants' motion to dismiss this claim is denied.

4.      Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); see 42 U.S.C. § 12203(a); Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001). The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action. Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

"The requirement of an adverse employment action seeks to differentiate those harms that work a significant detriment on employees from those that are relatively insubstantial or trivial." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 431 (4th Cir. 2015). For purposes of a Title VII retaliation claim, an adverse employment action is any "materially adverse" action. Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). A "materially adverse" action is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Id. (internal citations omitted).

"[A]lthough an adverse action need not affect the terms and conditions of employment, there must be some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." Ray v. Int'l Paper Co., 909 F.3d 661, 670 (4th Cir. 2018) (internal quotations and citations omitted). Indeed, an employee is not immunized from "those petty slights or minor annoyances that often take place at work" because she engages in protected activity. White, 58 U.S. at 68. Likewise, "conflicts at work that generate antipathy and snubbing by supervisors" do not rise to the level of materially adverse employment actions. Id. (internal quotations and citation omitted).

Here, plaintiff alleges she engaged in protected activity by "complain[ing] of Captain Jefferies's discriminatory and harassing behavior" to officials within the chain of command, including Major Thomas, Colonel Worrell, and Major Zimmerman and by telling defendant Sheriff Miller about Captain Jefferies's alleged conduct when she tendered her resignation and two weeks' notice. (Pl. Am. Compl. (DE 18) ¶ 36, 41). Such conduct constitutes protected activity for purposes of a retaliation claim. See DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) ("[P]rotected activity includes complaining about unlawful practices to a manager, the union, or other employees.") (citation omitted).

Regarding the second element, plaintiff argues that she pleaded three materially adverse employment actions. First, plaintiff claims that Major Zimmerman's directive for plaintiff to move her desk to another floor so that she would not be near Captain Jefferies constitutes a materially adverse employment action. In support, plaintiff indicates she felt as if she was being punished

for having complained, since she was forced to move instead of Captain Jefferies. However, requiring plaintiff to move her desk to another floor does not constitute an adverse employment action. Indeed, the Fourth Circuit has held a new job assignment, even if less appealing to the employee, does not amount to an adverse employment action, "absent any decrease in compensation, job title, level of responsibility or opportunity for promotion." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). Here, plaintiff does not even allege a new job assignment, much less a decrease in salary or level of responsibility; she merely alleges she was forced to relocate her workstation. Rather than working a "significant detriment" on plaintiff, this action was "relatively insubstantial or trivial." See Adams, 789 F.3d at 431.

Next, plaintiff argues defendant OSCO's failure to remedy the alleged harassment constitutes an adverse employment action. In support, plaintiff relies on Ibrahim v. Unisys Corp., 582 F. Supp. 2d 41, 417-48 (D.D.C. 2008), a case where the court found plaintiff's allegations of unabated discrimination following complaint thereof sufficient to withstand a motion to dismiss. However, Ibrahim was decided before the Supreme Court imposed heightened pleading standards in Twombly and Iqbal. Moreover, the instant case is instructively distinguishable from Ibrahim. Although plaintiff alleges nothing was done to curtail Captain Jefferies's alleged discrimination and harassment after she reported it to Major Tommie Thomas, Colonel Worrell, and Major Zimmerman in February and March 2018, she also alleges that on March 12, 2018, defendant Sheriff Miller "express[ed] surprise that Plaintiff had not brought her complaints to him personally." (Pl. Am. Compl. (DE 18) ¶¶ 42-43). Moreover, even though defendant Sheriff Miller allegedly told plaintiff "she should have been able to handle the situation herself[,]" he also allegedly stated that "it would take time for him to fix the situation if he were given the opportunity to do so." (Id. ¶ 44). Yet, plaintiff tendered her resignation and two weeks' notice anyway,

effectively depriving defendant Sheriff Miller an opportunity to remedy the situation. Then, the day after plaintiff complained to defendant Sheriff Miller, Major Zimmerman allegedly asked plaintiff to move her desk to another floor so that she would not be near Captain Jefferies. (Id. ¶ 45). Thus, unlike in Ibrahim, here steps were taken to mitigate the alleged harassment.

It also bears noting that the phrase "materially adverse employment action" necessarily implies the undertaking of an affirmative action. Therefore, even if plaintiff's employer ignored her complaints and allowed the alleged harassment to continue, which plaintiff has not plausibly alleged, the court questions whether such passivity could qualify as an adverse employment action.

Finally, plaintiff argues her alleged constructive discharge constitutes an adverse employment action. A constructive discharge can amount to adverse employment action. See James v. Booz-Allen & Hamilton Inc., 368 F.3d 371, 378 (4th Cir. 2004). "To prove constructive discharge, a plaintiff must at the outset show that his employer 'deliberately made [her] working conditions intolerable in an effort to induce [her] to quit.'" Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006) (quoting Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 272 (4th Cir. 2001)). "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985).

Regarding the first element, "[d]eliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit." Id. Such intent "may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." Id. The second element, "[i]ntolerability[,] is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to

resign." Perkins, 936 F.3d at 212. Rather, "intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign, that is, whether he would have had no choice but to resign." Id. (emphasis in the original).

Here, plaintiff fails to plausibly allege a claim for constructive discharge. Although plaintiff alleges she complained of Captain Jefferies's alleged conduct to officials within the chain of command in February and March 2018, and "specifically informed Captain Lewis and Major Thomas that she did not know how much longer she could stand being subjected to it[,]" she also alleges that on March 12, 2018, defendant Sheriff Miller expressed surprise that plaintiff had not brought her complaints to him personally. (See Pl. Am. Compl. (DE 18) ¶¶ 36, 42, 43). Moreover, while defendant Sheriff Miller allegedly told plaintiff she should have been able to handle the situation herself, he also allegedly told plaintiff that it would take time for him to fix the situation if he were given the opportunity to do so. (See id. ¶ 44). Thus, rather than showing a failure to act in the face of known intolerable conditions, plaintiff's complaint suggests that defendant Sheriff Miller did not know about Captain Jefferies's alleged conduct, and upon learning of it, he expressed a willingness to "fix" the situation, if given the opportunity and time to do so. As a result, plaintiff fails to satisfy the deliberateness element of her constructive discharge claim.

Likewise, although plaintiff plausibly alleged a hostile work environment, the intolerability element of a constructive discharge claim requires "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Perkins, 936 F.3d at 212. Indeed, while navigating an alleged hostile work environment, "[u]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). In effect, plaintiff's constructive discharge claim fails.

In sum, where plaintiff fails to allege a materially adverse employment action, plaintiff's claim for retaliation under Title VII is dismissed without prejudice.

5.     42 U.S.C. § 1983

Plaintiff asserts a claim under 42 U.S.C. § 1983 against defendant Sheriff Miller in his personal capacity, his official capacity, and his supervisory capacity.  Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law."  Jenkins v. Medford, 119 F.3d 1156, 1159–60 n.3 (4th Cir. 1997) (en banc) (citing 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988)).  The court will address plaintiff's allegations against defendant Sheriff Miller with respect to each of his capacities, in turn below.

a.     Personal Capacity

A plaintiff establishes personal liability under § 1983 by "affirmatively show[ing] that the official charged acted personally in the deprivation of the plaintiff's rights."  Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018).  This means that "the official's own individual actions must have violated the Constitution."  Id. (citing Iqbal, 556 U.S. at 676).  "Importantly, mere knowledge of such a deprivation does not suffice."  Id.

Here, plaintiff argues defendant Sheriff Miller violated plaintiff's equal protection rights by improperly dismissing her complaints about Captain Jefferies when he allegedly told her that she should have been able to handle the situation herself.  However, assuming arguendo that dismissing plaintiff's complaints about Captain Jefferies would give rise to personal liability under § 1983, plaintiff's complaint does not support such an allegation, where plaintiff also alleges that, during that same conversation, defendant Sheriff Miller expressed surprise that she had not brought

her complaints about Captain Jefferies to him personally and told her that it would take time to fix the situation if he were given the opportunity to do so.  (Pl. Am. Compl. (DE 18) ¶¶ 41-42).

        b.      Official Capacity

An official-capacity suit under § 1983 is "treated as a suit against the entity." <u>King</u>, 825 F.3d at 223 (citing <u>Kentucky</u>, 473 U.S. 159, 166 (1985)).  In effect, "[a] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit, the entity's policy or custom must have played a part in the violation of federal law." <u>Kentucky</u>, 473 at 166 (quoting <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978)).

Regarding her official capacity claim, plaintiff alleges that when she "addressed her complaints directly to Defendant [Sheriff] Miller, Defendant [Sheriff] Miller established an unconstitutional policy and practice upon the basis of which he unlawfully rejected Plaintiff's complaints."  (Pl. Am. Compl. (DE 18) ¶ 73).  Plaintiff further alleges "Defendant [Sheriff] Miller's failure to address Plaintiff's complaints, including his statement to her that she should have been able to handle the discrimination she encountered on her own, made these aspects of Plaintiff's employment the official policy or custom of Defendants." (<u>Id.</u> ¶ 74).  However, in describing defendant OSCO's alleged policy, plaintiff omits allegations made earlier in her complaint, including the allegation that defendant Sheriff Miller expressed surprise over plaintiff not bringing her complaints to him personally, and that he told plaintiff that it would take time for him to fix the situation if he were given the opportunity to do so.  (<u>See</u> Pl. Am. Compl. (DE 18) ¶¶ 42, 44).  Considering defendant Sheriff Miller's alleged response to plaintiff's complaints as a whole, plaintiff fails to plausibly allege that defendant Sheriff Miller established a policy or custom that was a moving force behind her alleged discrimination.

c.     Supervisory Capacity

A supervisor can be liable under § 1983 "where (1) he knew that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) his response showed deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between his inaction and the constitutional injury." King, 825 F.3d at 224 (internal quotations omitted).  To establish deliberate indifference, a plaintiff must demonstrate "a supervisor's continued inaction in the face of documented widespread abuses."  Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted). However, a "plaintiff assumes a heavy burden of proof in establishing deliberate indifference because . . . a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." Id.

Plaintiff fails to plausibly allege that defendant Sheriff Miller's response to Captain Jefferies's alleged conduct showed deliberate indifference.  Although plaintiff alleges that defendant Sheriff Miller told plaintiff she should have been able to handle the situation herself, he also allegedly expressed surprise that plaintiff had not brought her complaints to him personally, and told plaintiff that it would take time for him to fix the situation if he were given the opportunity to do so.  (See Pl. Am. Compl. (DE 18) ¶¶ 42, 44).   Moreover, after plaintiff tendered her resignation and two weeks' notice, she was allegedly asked to move her desk to another floor so that she would not be near Captain Jefferies during her final two weeks.  (Id. ¶¶ 41, 45).  Where such allegations do not reflect "continued inaction in the face of documented widespread abuses[,]" Shaw, 13 F.3d at 799, plaintiff fails to allege deliberate indifference on part of defendant Sheriff Miller.

In sum, plaintiff fails to plausibly alleges a claim under 42 U.S.C. § 1983 against defendant Sheriff Miller in his personal capacity, his official capacity, or his supervisory capacity; therefore, such claims are dismissed without prejudice.

6.      42 U.S.C. § 1986

Plaintiff claims defendants negligently failed to prevent the violation of her civil rights, in violation of 42 U.S.C. § 1986.  That provision provides: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . shall be liable to the party injured  . . ."  42 U.S.C. § 1986. Accordingly, "[a] cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." Trerice v. Summons, 755 F.2d 1081, 1085 (4th Cir. 1985).

Although plaintiff does not indicate which subsection of § 1985 her § 1986 claim is based upon, the only applicable subsection is § 1985(3). Cf. 42 U.S.C. § 1985(1) (providing private right of action for conspiracies to prevent officer from performing duties); 42 U.S.C. § 1985(2) (providing private cause of action for conspiracies to obstruct justice, or to intimidate a party, witness or juror).  Subsection three provides, "[i]f two or more persons in any State . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . ." then those persons shall be liable. 42 U.S.C. § 1985(3).  An action under section 1985(3) consists of the following elements:

> (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir. 1985).

To satisfy the first element, "a claimant must show an agreement or a meeting of the minds by defendants to violate the claimant's constitutional rights." <u>Simmons v. Poe</u>, 47 F.3d 1370, 1377 (4th Cir. 1995). The Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." <u>A Soc'y Without A Name v. Virginia</u>, 655 F.3d 342, 346 (4th Cir. 2011). Here, plaintiff fails to allege any facts regarding a conspiracy or a meeting of the minds. Moreover, deprivation of a right created by Title VII cannot form the basis for a cause of action under § 1985(3). <u>See</u> <u>Great Am. Fed. Sav. & Loan Ass'n v. Novotny</u>, 442 U.S. 366, 378 (1979); <u>see, e.g.</u>, <u>Ward v. Coastal Carolina Health Care, P.A.</u>, 597 F. Supp. 2d 567, 573 (E.D.N.C. 2009). Accordingly, plaintiff's claim under 42 U.S.C. § 1986 is dismissed without prejudice.

## CONCLUSION

Based on the foregoing, the court orders the following:

1) Defendants' motion to dismiss (DE 36) is GRANTED IN PART and DENIED IN PART, and defendants' motion to dismiss (DE 53) is GRANTED. Plaintiff's retaliation, § 1983, and § 1986 claims are DISMISSED WITHOUT PREJUDICE, and plaintiff's hostile work environment and NCWHA claims are ALLOWED to proceed. Within **21 days** of this order, plaintiff is ALLOWED to file a motion to amend, together with proposed second amended complaint, correcting the deficiencies noted herein.

3) Where defendant OSCO lacks the capacity to be sued, and where such incapacity cannot be overcome by further factual specificity, plaintiff's claims against defendant OSCO are DISMISSED WITH PREJUDICE.

4)      On its own initiative, the court EXTENDS the dispositive motions deadline to not later than **30 days** after United States Magistrate Judge Robert B. Jones, Jr. rules on defendants' pending motion to compel and motion for leave to file excess pages.

5)      As set forth in United States Magistrate Judge Robert B. Jones, Jr.'s March 11, 2020, order, the parties shall conduct mediation within **45 days** of this order.

SO ORDERED, this the 5th day of June, 2020.


LOUISE W. FLANAGAN
United States District Judge