IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CV-206-FL

| | | |
|---|---|---|
| MARISA REVAK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HANS J. MILLER, Sheriff, in his | ) | ORDER |
| official and individual capacity, and THE | ) | |
| OHIO CASUALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (DE 106).[1]  The motion has been briefed fully, and in this posture, the issues raised are ripe for ruling.  For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff initiated this employment discrimination action November 20, 2018, and filed the operative second amended complaint August 17, 2020, asserting claims for hostile work environment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII"), and violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983.[2]

---

[1]  Also pending are motions to seal, filed by plaintiff (DE 130) and defendants (DE 131), which are granted as set forth herein.

[2]  Plaintiff also brought a claim for unpaid wages under the North Carolina Wage and Hour Act in her second amended complaint.  On October 6, 2020, the court granted defendants' motion to dismiss that claim, which plaintiff did not oppose.

Following an extended period of discovery, and in accordance with the court's case management order, defendants filed the instant motion for summary judgment on September 28, 2020, relying upon a memorandum of law. The next day, defendants filed a statement of material facts, and an appendix thereto, including: 1) affidavits of Captain Jon Julian Lewis ("Captain Lewis"), Captain Linwood Straughn ("Captain Straughn"), Sergeant Marc Wyatt Alwes ("Sergeant Alwes"), Sergeant Shannon Ayers Dunleavy ("Sergeant Dunleavy"), Major Lewis Zimmerman, III ("Major Zimmerman"); and 2) excerpts of depositions of Lieutenant Michael Barron ("Lieutenant Barron"), Captain Frederick Jefferies ("Captain Jefferies"), Captain Lewis, defendant Hans J. Miller ("Miller"), Christine Parrott ("Parrott"), plaintiff, Weston Revak, Major Tommie Thomas ("Major Thomas"), Colonel Donald Worrell ("Colonel Worrell"), and Major Zimmerman.[3]

Plaintiff responded in opposition to defendants' motion for summary judgment, on June 10, 2021, relying upon a memorandum of law, an opposing statement of material facts, and an appendix thereto, including: 1) excerpts of depositions of Captain Jefferies, Captain Lewis, defendant Miller, Parrott, plaintiff, Major Thomas, Colonel Worrell, and Major Zimmerman; 2) excerpts of plaintiff's journal; 3) defendant Miller's responses to interrogatories; 4) excerpts of the Onslow County Sheriff's Office's Standard Operating Procedures; 5) email to Onslow County Sheriff's Office's employees; and 6) Captain Jefferies's personnel file. Shortly thereafter, the parties filed the instant motions to seal Captain Jefferies's personnel file, as well as all references thereto in plaintiff's response brief and statement of material facts.

---

[3]    Upon defendants' later motions, the court deemed their statement of material facts and appendix thereto timely filed, and allowed defendants to file an amended statement of material facts and memorandum of law on May 28, 2021. That same day, the court granted plaintiff's motion to strike in part, striking the affidavits of Captain Straughn, Sergeant Alwes, and Sergeant Dunleavy.

2

Defendants then replied in support of their summary judgment motion, relying upon an opposing statement of material of facts and appendix thereto, including excerpts of depositions of Captain Jefferies, defendant Miller, Parrott, plaintiff, Weston Revak, Colonel Worrell, and Major Zimmerman.

## STATEMENT OF FACTS

The undisputed facts, and facts viewed in the light most favorable to plaintiff, may be summarized as follows.

At all times relevant to the instant action, defendant Miller was the duly elected sheriff of Onslow County, North Carolina. (Pl. Opp. Stmt. (DE 126) ¶ 2).[4] On March 8, 2015, the Onslow County Sheriff's Office hired plaintiff to work 12-hour shifts as a detention officer. (Def. Opp. Stmt. (DE 133) ¶¶ 1-2). In 2016, plaintiff's husband, an instructor in the United States Marine Corps, received a special duty assignment, which required him to remain on base several nights each week. (Id. ¶ 3). Around that time, plaintiff was reassigned to the detention center's holdings facility, so that she could work an 8:00 a.m. to 5:00 p.m. schedule and be home with her children in the evening to avoid childcare expenses. (Pl. Opp. Stmt. (DE 126) ¶¶ 13-14; Pl. Dep. (127-11) 11:13-20).

In May 2017, plaintiff was reassigned to work at the video visitation desk to assist Parrott, who would be missing work for extended periods of time due to a serious medical condition. (Def. Opp. Stmt. (DE 133) ¶ 7). In her new assignment, plaintiff was able to maintain her 8:00 a.m. to 5:00 p.m. schedule and was supervised by Captain Jefferies. (Id. ¶ 8). Captain Jefferies, a former Marine, has been described as "loud" and "kind of gruff", and he was known to yell at people. (Def. Miller Dep. (DE 127-9) 90:5-9; Zimmerman Dep. (DE 127-14) 106:9-11). Plaintiff testified

---

[4] Where a fact asserted in a party's statement of material facts is undisputed, the court cites to the <u>opposing</u> party's responsive statement of facts, where it indicates the fact is admitted or undisputed or without opposing fact.

that, while being supervised by Captain Jefferies, she experienced a babysitting issue. (Pl. Dep. (DE 127-11) 65:19-21). According to plaintiff's testimony, Captain Jefferies responded to the babysitting issue by telling plaintiff he did not understand why women with children worked, and since plaintiff could not make her 8:00 a.m. to 5:00 p.m. shift work, she should be put back on her 12-hour shift. (Id. 65:10-25).

While working under Captain Jefferies's supervision, plaintiff's responsibilities included screening inmate mail. (Pl. Opp. Stmt. (DE 126) ¶ 25). In June 2017, plaintiff allowed a greeting card with glitter on it to be delivered to an inmate. (Pl. Opp. Stmt. (DE 126) ¶ 26; Def. Opp. Stmt. (DE 133) ¶ 26). Distributing items with glitter to inmates presents a safety issue because controlled substances can be hidden in glitter.[5] (Id.). Captain Jefferies reprimanded plaintiff in "stern" manner. (Jefferies Dep. (DE 109-7) ¶ 72:12-15; Pl. Dep. (DE 127-11) 101:19-20; Def. Opp. Stmt. (DE 133) ¶ 30). Plaintiff approached Lieutenant Barron to ask about glitter being distributed to inmates, and Lieutenant Barron testified that, upon hearing plaintiff's question, Captain Jefferies stated, "Why are you asking a subordinate officer the same question you go just got an answer from me?" (Barron Dep. (DE 109-6) 19:23-25). Plaintiff testified that Captain Jefferies asked her "what the h*ll do you think you're doing?" (Pl. Dep. (DE 127-11) 103:11-13).

At some point in 2017, plaintiff expressed interest in attending an annual jail training conference. (Pl. Dep. (DE 127-11) 133:9-22). Typically, two female employees and two male employees were sent to the conference each year. (Jefferies Dep. (DE 109-7) 90:19-91:6; Pl. Dep. (DE 127-11) 133:1-10). Plaintiff testified that Captain Jefferies told her she could not go because "[her] place was at home with [her] kids." (Pl. Dep. (DE 127-11) 133:11-15).[6]

---

[5]     The parties dispute whether there was a rule prohibiting glitter in effect at that time, but this dispute is not material to matters under consideration.

[6]     By contrast, Captain Jefferies testified that he did not remember saying that to plaintiff, and that instead, he

4

According to plaintiff's testimony, in October 2017 a family wanted to communicate with an inmate, so Captain Jefferies suggested that the family set up an account through Paytel, an inmate communication system at the jail. (Pl. Dep. (DE 27-11) 139:4-22). Overhearing this conversation, plaintiff told the family, "wait a minute, [the inmate is] actually at the booking desk right now", because she did not want the family to waste time setting up a Paytel account if the inmate was about to be released. (Id. 140:3-11). Plaintiff testified that Captain Jefferies "flipped out" on her, stating "what the h*ll are you talking about." (Id. 140:13-14). According to plaintiff's testimony, she responded "I just thought", and Captain Jefferies interrupted her, by stating "that's your problem you f***ing think." (Id. 140:16-17).[7]

In January 2018, upon discovering that the Onslow County Sheriff's Office was going to close because of snow, Parrott and plaintiff approached Major Zimmerman, asking if they could work on a Saturday to make up the missed hours, instead of using their vacation time. (Parrott Dep. (DE 127-10) 23:7-24; Pl. Dep. (DE 127-11) 147:1-12; Zimmerman Dep. (DE 127-14) 61:5-7). Overhearing the conversation, Captain Jefferies walked into the office. (Parrott Dep. (DE 127-10) 23:21-24; Pl. Dep. (DE 127-11) 147:16-19; Zimmerman Dep. (DE 127-14) 61:7- 63:19). Plaintiff and Parrott testified that Captain Jefferies said, "The h*ll you are. You're going to take vacation like everybody else." (Parrott Dep. (DE 127-10) 23:24-24:2; Pl. Dep. (DE 127-11) 147:16-19). Major Zimmerman informed Captain Jefferies that defendant Miller had already authorized the weekend work request, and followed Captain Jefferies back to his office, where he reprimanded Captain Jefferies for his actions. (Zimmerman Dep. (DE 127-14) 61:25-63:5).

---

told her he was going to send to the conference the employees who had worked at the Onslow County Sheriff's Office the longest. (Jefferies Dep. (109-7) 90:16-23).

[7]      Captain Jefferies testified that he did not remember this incident. (Jefferies Dep. (DE 109-7) 92:12-20).

Plaintiff also testified that on at least two occasions, on or about January 8 or January 9, 2018, Captain Jefferies threw papers on plaintiff's desk. (Pl. Dep. (DE 127-11) 150:3-15). On one such occasion, the papers knocked over a drink on plaintiff's desk. (Id. 150:16-18). In addition, plaintiff testified that she approached Captain Jefferies over the number of hours he included on her timecard, and Captain Jefferies would say "who runs this f'ing jail." (Pl. Dep. (DE 127-11) 164:10-14).

Plaintiff and Parrot met with defendant Miller on March 12, 2018, to tender plaintiff's resignation. (Def. Opp. Stmt. (DE 133) ¶ 59; Parrott Dep. (DE 127-10) 45:6-15). Parrott testified that defendant Miller "listened to everything we had to say, and he initially said he was very disappointed in us that we didn't come see him first." (Parrott Dep. (DE 127-10) 46:16-18). Defendant Miller testified that he told plaintiff "I hate to lose you" and offered to make "reasonable accommodations", but plaintiff said, "I've already made up my mind, and I'm – I'm going to resign." (Def. Miller Dep. (DE 109-9) 46:1-5, 48:5-6).

Additional facts will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.      Summary Judgment

1.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

6

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable

inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

      2.      Analysis

          a.      Hostile Work Environment

Defendants move for summary judgment on plaintiff's hostile work environment claim.

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008). To establish a hostile work environment claim, "a claimant must demonstrate that the alleged conduct: 1) was unwelcome; 2) resulted because of her gender [ ]; 3) was sufficiently severe or pervasive to alter the conditions of her employment; and 4) was imputable to her employer." Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009).

"[A]n employee is harassed or otherwise discriminated against because of his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination." Ziskie v. Mineta, 547 F.3d 220, 226 (4th Cir. 2008) (internal citations omitted). A plaintiff "may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions, but can succeed only by showing that she is the individual target of open hostility because of her sex." Id. (internal quotations omitted).

Whether the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment involves "both subjective and objective components." Ocheltree v.

Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (en banc). In considering whether a working environment is objectively hostile, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Plaintiff fails to produce evidence from which a reasonable trier of fact could find that her gender was the but-for cause of the alleged harassment. The evidence shows that Captain Jefferies, a former Marine with a loud and gruff demeanor, often yelled at plaintiff, and on at least two occasions, threw papers at her. However, Captain Jefferies's callous behavior is insufficient to establish harassment on the basis of sex. First, the evidence does not suggest that Captain Jefferies's abrasive behavior was directed solely at plaintiff or other females. In fact, Parrott testified that Captain Jefferies treated one pregnant female employee favorably, allowing her to work overtime during a holiday weekend despite opposing a similar request made by plaintiff. (Parrott Dep. (DE 109-11) 115:). Moreover, Captain Jefferies testified that in 2014 or 2015 a male officer quit because Captain Jefferies yelled at him, so defendant Miller "called [him] and told [him] that, hey, [he] need[ed] to be nice, be nice to people." (Jefferies Dep. (DE 109-7) 20: 21-25).

Second, Captain Jefferies's "outbursts" do not evince a gendered motive. Rather, certain incidents reveal a disciplinary motive, such as when Captain Jefferies reprimanded plaintiff for giving an inmate a greeting card with glitter. (Jefferies Dep. (DE 109-7) ¶ 72:12-15; Pl. Dep. (DE 127-11) 101:19-20; Def. Opp. Stmt. (DE 133) ¶ 30). Other incidents reflect frustration over perceived chain of command violations, such as when Captain Jefferies asked plaintiff "Why are you asking a subordinate officer the same question you go just got an answer from me?" (Barron

9

Dep. (DE 109-6) 19:23-25), when plaintiff disagreed with Captain Jefferies's recommendation to a family to set up a Paytel account, (Pl. Dep. (DE 27-11) 139:4-140-14), and when plaintiff questioned the accuracy of her timecard, (Pl. Dep. (DE 127-11) 164:10-14). Still others demonstrate Captain Jefferies's frustration over plaintiff seeking benefits presumably not available to others, such as when Captain Jefferies overheard plaintiff's request to work over the weekend and yelled: "The h*ll you are. You're going to take vacation like everybody else." (Parrott Dep. (DE 127-10) 23:24-24:2; Pl. Dep. (DE 127-11) 147:16-19), or frustration that plaintiff had a babysitting issue, despite being given an 8:00 a.m. to 5:00 p.m. schedule to accommodate her childcare needs. [8] (Pl. Dep. (DE 127-11) 65:19-21; Pl. Stmt. (DE 126) ¶ 5). While these incidents reveal that Captain Jefferies often yelled at plaintiff, they fall short of showing a gendered motive. Importantly, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to race or gender, manage to make themselves disliked." Ziskie, 547 F.3d at 226.[9]

To show but-for cause, plaintiff points to Parrott's testimony that Captain Straughn overheard Captain Jefferies call plaintiff and Parrott "f***ing b****es. (See Parrott Dep. (DE 109-11) 66:19-25). However, Parrott lacks personal knowledge as to whether Captain Jefferies said those words, rendering this testimony inadmissible. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

---

[8]     Although grouped with other alleged "outbursts" in this paragraph, plaintiff's testimony does not indicate that Captain Jefferies yelled at her over the babysitting issue. (Pl. Dep. (DE 127-11) 65:19-21).

[9]     The court distinguished Ziskie when ruling on motion to dismiss. (See Order (DE 88) at 13). However, considering the evidence presented, and under the summary judgment standard of review, the court now finds Ziskie to be a more analogous case.

Plaintiff argues that the evidence should not be disregarded merely because she personally did not hear Captain Jefferies use the epithet, citing Jennings v. Univ. of N. Carolina, 482 F.3d 686 (4th Cir. 2007) (en banc) and Perkins v. Int'l Paper Co., 936 F.3d 196 (4th Cir. 2019). Plaintiff's argument confuses the issue. The United States Court of Appeals for the Fourth Circuit has held that "evidence about how other employees were treated in that same workplace can be probative of whether the environment was indeed a sexually hostile one, even if the plaintiff did not witness the conduct herself." Ziskie, 547 F.3d at 225; see Jennings, 482 F.3d at 696 ("Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances."); Perkins, 936 F.3d at 210 ("[T]the fact that an employee does not witness statements made to third parties does not bar their consideration . . . the evidence of racially offensive conduct that Perkins heard about second-hand should not be disregarded simply because he did not witness it."). But such evidence must be presented in an admissible form. See Ziskie, 547 F.3d at 225 ("[U]nder the Federal Rules of Civil Procedure, oppositions to summary judgment may be supported by affidavits if those affidavits are 'made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.'" (quoting Fed. R. Civ. P. 56(e))). For example, in Ziskie, the offensive conduct, which plaintiff did not witness, was presented in affidavits of co-workers who did witness it. See id.

If plaintiff could present testimony of Captain Straughn, indicating that he heard Captain Jefferies use the epithet, such evidence would be admissible, regardless of whether plaintiff also heard it, because Captain Straughn has personal knowledge on the matter. Yet, plaintiff has not done so, and she has not shown that she would be able to proffer such testimony at a trial.[10] See

---

[10] There is no testimony of Captain Straughn in the record. Defendants initially proffered affidavit of Captain Straughn, but the court granted plaintiff's motion to strike this affidavit. (See Order (DE 122)).

Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015) (holding that on summary judgment, the court may consider the "content or substance of . . . materials where the 'the party submitting the evidence shows that it will be possible to put the information into an admissible form.'" (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)). Therefore, Parrott's testimony, about what Captain Straughn heard, is inadmissible.

Plaintiff also argues that her gender caused the alleged harassment because Captain Jefferies referred to her as "little girl", (see Pl. Dep. (DE 127-11) 123:1-4), he once told her that "[her] place was at home with [her] kids", (id. 133:14-15), he stated he did not understand why women with children worked, (id. 65:10-25), and he "made it clear [his] wife never worked. She stayed home and took care of the kids and I sent home the money", (id. 156:9-13). While evincing certain views about gender, these stray comments were not made in conjunction with Captain Jefferies's "outbursts", and are thus too attenuated to give rise to a reasonable inference of but-for causation. Moreover, although plaintiff testified that Captain Jefferies told her she could not go to the jail training conference because her place was at home with her kids, two females were typically selected to attend the conference each year, (Pl. Dep. (DE 27-11) 133:1-22), and Major Zimmerman, not Captain Jefferies, made the ultimate decision as to who could attend, (Jefferies Dep. (DE 109-7) 89:24-90:2).

Even assuming plaintiff's gender was the but-for cause of the alleged harassment, plaintiff fails to produce evidence from which a reasonable trier of fact could infer that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment. Plaintiff points to evidence that Captain Jefferies: referred to her as "little girl", (see Pl. Dep. (DE 127-11) 123:1-4); stated that he did not understand why women with children worked, (id. 65:10-

12

25); told her that "[her] place was at home with [her] kids", (id. 133:14-15); "made it clear [his] wife never worked. She stayed home and took care of the kids and I sent home the money", (id. 156:9-13), threw papers at plaintiff's desk, once knocking over a drink, (id. 150:3-18); and yelled at plaintiff for giving an inmate a card with glitter, (Jefferies Dep. (DE 109-7) ¶ 72:12-15; Pl. Dep. (DE 127-11) 101:19-20 ), for questioning her timecard, (Pl. Dep. (DE 127-11) 164:10-14), for requesting to work on the weekend, (Parrott Dep. (DE 127-10) 23:24-24:2; Pl. Dep. (DE 127-11) 147:16-19), and for telling a family not to set up a Paytel account, (Pl. Dep. (DE 127-11) 140:3-17). (Mem. (DE 125) at 19-20).[11] These incidents do not amount to objectively severe or pervasive harassment. As the Fourth Circuit has explained:

> Title VII does not establish a general civility code for the American workplace . . . Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.

Sunbelt Rentals, Inc., 521 F.3d at 315–16 (internal and citation quotations omitted); see Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) ("Even viewed in the light most favorable to Bass, the facts she alleges merely tell a story of a workplace dispute regarding her reassignment and some perhaps callous behavior by her superiors."). And here, the record reflects "callous behavior by one's superior[] or a routine difference of opinion and personality conflict with one's supervisor", Sunbelt Rentals, 521 F.3d at 316, rather than objectively severe and pervasive harassment.

Plaintiff argues that Captain Jefferies's role as her supervisor would allow a reasonable jury to find that the alleged harassment was severe and pervasive. It is true that "a supervisor's

---

[11]     Plaintiff also relies upon Parrott's testimony that Captain Straughn overheard Captain Jefferies refer to plaintiff and Parrott as "f*cking b*tches." As set forth in more detail herein, this testimony is inadmissible.

power and authority invests his or her harassing conduct with a particular threatening character."

Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Burlington

Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998)).  Here, however, the record shows that Captain

Jefferies had supervisory authority over some aspects of plaintiff's work but not others.  For

example, Captain Jefferies, lacked the ultimate authority to decide whether plaintiff could attend

the jail training conference, (Jefferies Dep. (DE 109-7) 89:24-90:2), which reduces the impact of

his statement that plaintiff could not attend because her place was at home with her kids.  (Pl. Dep.

(DE 127-11) 133:14-15).   Likewise, Captain Jefferies lacked authority to change plaintiff's shift

assignments, (id. 82:12-16), rendering hollow his threat to change plaintiff's shift when she

experienced a babysitting issue.  (Pl. Dep. (DE 127-11) 65:10-21).    Finally, plaintiff obtained

permission from Major Zimmerman, rather than Captain Jefferies, to make up a snow day by

working on the weekend, (Parrott Dep. (DE 127-10) 23:7-24; Pl. Dep. (DE 127-11) 147:1-12;

Zimmerman Dep. (DE 127-14) 61:5-7), and to assist with prisoner transports, (Pl. Dep. (DE 127-

11) at 195:15-17).  Thus, while Captain Jefferies' position as supervisor exacerbated the severity

of the alleged harassment, given the limits on his supervisory authority, it does not in itself serve

to create a genuine issue of material fact that the alleged harassment was severe or pervasive.  Cf.

E.E.O.C. v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 329 (4th Cir. 2010) (explaining that an

alleged harasser's status as supervisor enhances the harassment's severity because of the harasser's

"authority over [plaintiff]" and "ability to influence the rest of [plaintiff's] career]").

Next, plaintiff argues the alleged harassment was objectively severe or pervasive because

she has identified ten incidents that occurred within one year.   To be sure, the alleged incidents

occurred with more frequency here than in cases such as Perkins, where the Fourth Circuit held

that two incidents, eight years apart were not pervasive.  936 F.3d at 210.  Here, however, plaintiff

has aggregated ten incidents of varying degrees of severity. Only four of those incidents explicitly involve gender, and only two of those four directly pertained to plaintiff. (See Pl. Dep. (DE 127-11) 123:1-4) (testimony that Captain Jefferies referred to plaintiff as "little girl"); (id. 133:14-15) (testimony that Captain Jefferies told plaintiff "[her] place was at home with [her] kids"). Importantly, the Fourth Circuit has "recognized that there is a difference between 'generalized' statements that pollute the work environment and 'personal gender-based remarks' that single out individuals for ridicule. Common experience teaches that the latter have a greater impact on their listeners and thus are more severe forms of harassment." Fairbrook Med. Clinic, 609 F.3d at 328–29 (citing Conner v. Schrader–Bridgeport Int'l, Inc., 227 F.3d 179, 197 (4th Cir.2000)). Here, the frequency of "person gender-based remarks" is considerably lower than cases such as Smith v. First Union Nat. Bank, where the supervisor made approximately 12 gender-related disparaging remarks to the plaintiff "on a regular basis." 202 F.3d 234, 243 (4th Cir. 2000).[12]

Plaintiff also argues that the alleged harassment was objectively severe and pervasive because it was physically threatening, pointing to her testimony that Captain Jefferies yelled at her and threw papers on her desk. However, such conduct is considerably less menacing when

---

[12]     In that case, the supervisor's discriminatory remarks to the plaintiff included the following:

(1) Scoggins would have preferred a male in the team leader position because males are "natural leaders"; (2) Smith would "crack" because women "are not emotionally capable of handling the management role"; (3) Scoggins would frequently remark to Smith that a woman who was upset "must be menstruating" or that she needed "a good banging"; (4) women were "out to get him" and that women generally conspire with each other against men; (5) Scoggins wished he were a woman so that he could "whore his way through life"; (6) Smith was lucky to have her job, and she would not get any further at First Union because she was not attractive; (7) the "only way for a woman to get ahead at First Union is to spread her legs"; (8) women had no place in management and did not even belong in college; (9) women should be "barefoot and pregnant"; (10) women go through life looking for a man to marry; (11) Barbara Judge, a female supervisor, was "sleeping her way to the top" and therefore she was a "classic example of why women should not be in management"; (12) women's hormones do not allow them to handle work matters in a professional manner.

First Union Nat. Bank, 202 F.3d at 243, n.6.

compared to hostile work environment claims that have succeeded in the Fourth Circuit. See, e.g., id. at 239 (finding a supervisor's conduct to be physically threatening where he "grabbed the handles of [plaintiff's] chair and spun her around to face him . . . then looked her over and stated . . . that he could 'see why a man would slit a woman's throat'" and "often concluded his orders to [plaintiff] by saying 'or else you'll see what will happen to you'").

Next, plaintiff argues that Captain Jefferies's comments regarding women in the workplace are objectively humiliating, relying upon Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 303 (4th Cir. 2019). In Parker, male employees circulated a rumor that the plaintiff "had sex with her male superior to obtain promotion, implying that [plaintiff] used her womanhood, rather than her merit, to obtain from a man, so seduced, a promotion." 915 F.3d at 303. The Fourth Circuit held that the rumor was humiliating because it "goes right to the core of somebody's merit as a human being to suggest they were promoted not on worth but for sexual favors", and the rumor engendered "open resentment and disrespect from [plaintiff's] coworkers, including those she was responsible for supervising." Parker, 915 F.3d at 305. Unlike the rumor in Parker, which was an attack against the plaintiff personally, Captain Jefferies's comments were more general in nature. Moreover, there is no evidence that the comments caused plaintiff's co-workers to disrespect her. Accordingly, this case is instructively distinguishable from Parker.

Finally, plaintiff argues a jury could find that the alleged harassment unreasonably interfered with plaintiff's work performance. In support, she points to testimony that Captain Jefferies was told in January 2018 to refrain from talking to plaintiff or supervising her. (Jefferies Dep. (DE 127-7) 45:10). As a result, plaintiff contends she was effectively operating without a manager. Plaintiff puts forth no evidence, however, on how this unreasonably impacted her work performance, and other evidence in the record shows that plaintiff was able to consult with other

16

officers in the chain of command, such as when plaintiff asked Major Zimmerman, rather than Captain Jefferies, for permission to make up a snow day by working on the weekend. (Parrott Dep. (DE 127-10) 23:7-24; Pl. Dep. (DE 127-11) 147:1-12; Zimmerman Dep. (DE 127-14) 61:5-7). Plaintiff also contends that Captain Jefferies did not give plaintiff the opportunity to learn when she made mistakes, pointing to testimony that he yelled at her when she asked Lieutenant Barrow a question about giving inmates glitter. (Barron Dep. (DE 109-6) 19:23-25; Pl. Dep. (DE 127-11) 103:11-13). However, plaintiff could learn about the glitter issue through other channels, such as consulting the Onslow County Sheriff's Office's standard operating procedures. (Jefferies Dep. (DE 109-7) ¶ 72:12-15).

In sum, plaintiff fails to present evidence from which a reasonable trier of fact could find that her gender was the but-for cause of the alleged harassment, or that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment. Accordingly, the court grants summary judgment to defendants on plaintiff's hostile work environment claim.

      b.     42 U.S.C. § 1983 Supervisory Liability

Defendants move for summary judgment on plaintiff's 42 U.S.C. § 1983 supervisory liability claim.

Supervisory liability under § 1983 "is not premised on respondeat superior but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984) (citation omitted). A supervisor can be liable under § 1983 "where (1) he knew that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) his response showed deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an

17

affirmative causal link between his inaction and the constitutional injury." <u>King v. Rubenstein</u>, 825 F.3d 206, 224 (2016) (internal quotations omitted).

Under the first prong, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations and citations omitted). To establish deliberate indifference, a plaintiff must demonstrate "a supervisor's continued inaction in the face of documented widespread abuses." <u>Id.</u> (internal quotations omitted). A plaintiff bears a "heavy burden of proof in establishing deliberate indifference because . . . a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." <u>Id.</u>

Plaintiff fails to put forth evidence from which a reasonable trier of fact could find that defendant Miller knew a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury. The record shows that plaintiff did not inform defendant Miller of Captain Jefferies's alleged conduct until the day she resigned; that day, defendant Miller listened to everything she had to say and expressed disappointment that plaintiff had not come to him first. (Parrott Dep. (DE 127-10) 46:16-18). He told plaintiff "I hate to lose you" and offered to make "reasonable accommodations." (Def. Miller Dep. (DE 109-9) 46:1-5). Plaintiff told defendant Miller "I've already made up my mind, and I'm - - I'm going to resign." (<u>Id.</u> 48:5-6). Rather than awareness and deliberate indifference, this evidence shows oblivion and a willingness to address the alleged harassment.

Plaintiff argues, however, that defendant Miller was aware of "the conduct", in light of testimony that plaintiff "made numerous complaints to other superior officers at the jail." (Mem.

(DE 125) at 23. Specifically, plaintiff points to testimony indicating that: 1) plaintiff and Parrott had complained to Major Thomas, Lieutenant Barron, Colonel Worrell, and Major Zimmerman that Captain Jefferies was ignoring them and acting hostile, (Parrott Dep. (DE 127-10) 39:10-43:4); 2) plaintiff and Parrott had approached Major Zimmerman twice, complaining that Captain Jefferies "was not nice", (Zimmerman Dep. (DE 127-14) 45:1-11); 3) plaintiff complained to Colonel Worrell that Captain Jefferies changed her timecard, and when Colonel Worrell offered to fix it, plaintiff stated "Well, no, no, I need the money", (Worrell Dep. (DE 127-13) 47:1-8); 4) defendant Miller received information from Major Zimmerman and Colonel Worrell that plaintiff "was not happy with Captain Jefferies because he was loud . . . that he threw a paper or some mail onto her desk . . that he was loud and gruff and that she felt unhappy or under stress", (Def. Miller Dep. (DE 127-9) 88:24-89:13); and 5) after defendant Miller received information from Major Zimmerman, he held a conference with Captain Jefferies to address "his overall attitude", the problem between Captain Jefferies and plaintiff, and Captain Jefferies's "loudness and being gruff and everything", (id. 147:1-24). Complaints of Captain Jefferies ignoring plaintiff, not being nice, being loud and gruff, and throwing papers at plaintiff's desk are insufficient to place defendant Miller on notice of a persuasive or unreasonable risk of constitutional injury. Moreover, rather than showing deliberate indifference, the testimony cited by plaintiff shows that defendant Miller met with Captain Jefferies's to address his demeanor after he received information from Major Zimmerman that plaintiff was unhappy and stressed. (Id. 147:1-24).

Nevertheless, plaintiff argues defendant Miller was deliberately indifferent, pointing to his testimony that he "didn't do an investigation because we had a resignment [sic] and a retirement." (Def. Miller (DE 127-9) 117:2-10, 167:9-18). Even assuming this demonstrates deliberate indifference, there could not have been an affirmative causal link between defendant Miller's

19

decision not to investigate and the alleged constitutional injury, since defendant Miller's decision not to investigate occurred after plaintiff resigned and Captain Jefferies retired.

Accordingly, the court grants summary judgment in favor of defendants on plaintiff's § 1983 supervisory liability claim.

B.      Motions to Seal

The parties move to seal two pages of Captain Jefferies's personnel file, filed as an exhibit to plaintiff's response brief, as well as references thereto in plaintiff's response brief and statement of material facts.

In evaluating a motion to seal, in accordance with the mandatory procedure outlined by the Fourth Circuit in Stone v. Univ. of Maryland, 855 F.2d 178 (4th Cir.1988), the court must first "determine [whether] the source of [the public's] right of access . . . is based on the common law or the First Amendment" with respect to each document to be sealed. Id. at 180. This is because "different levels of protection may attach to the various records and documents involved in [a] case." Id. "The common law presumes a right to inspect and copy [all] judicial records and documents," and this presumption "may be overcome if competing interests outweigh the interest in access." Id. (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988); In re Washington Post Co., 807 F.2d 383, 390 (4th Cir.1986)).

The First Amendment guarantees a heightened presumption of access "only to particular judicial records and documents," including "documents filed in connection with [a] summary judgment motion in civil case." Id. (citing Rushford, 846 F.2d at 253). Where, as here, "the First Amendment guarantees access, . . . access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." Id. (citing

20

Rushford, 846 F.2d at 253; Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984)). In order to seal documents, the court must 1) "give the public notice of a request to seal and reasonable opportunity to challenge it," 2) "consider less drastic alternatives to sealing," and 3) "state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing." Stone, 855 F.2d at 181 (quoting In re Knight Pub. Co., 743 F.2d 231, 235 (4th Cir. 1984)).

Here, the parties seek seal of information from Captain Jefferies's personnel file. This information is deemed confidential pursuant to the court's protective order, as well as North Carolina General Statute § 153A-98(c), which provides: "[a]ll information contained in a county employee's personnel file … is confidential and shall be open to inspection only in" certain limited circumstances, such as "[b]y order of a court of competent jurisdiction." N.C. Gen. Stat. § 153A-98(c). This compelling government interest outweighs the public's right of access under the circumstances presented.

In addition, both motions to seal provide reasonable notice of the request to seal, and the public has had an opportunity to object to the request to seal. See In re Knight Pub. Co., 743 F.2d at 235. Finally, the requested relief is narrowly tailored, since plaintiff has filed redacted copies of her response brief and statement of facts, concealing Captain Jefferies's personnel information while leaving all other information visible. (Redacted Response Brief (DE 125); Redacted Stmt. (DE 126)). This is a reasonable alternative to sealing that adequately balances the public's right to access and the privacy of the parties. Although plaintiff has not filed a redacted version of the two-page exhibit from Captain Jefferies's personnel file, the court sees no less drastic alternative to the sealing of this exhibit. Therefore, parties' motions to seal are granted.

**CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment (DE 106), plaintiff's motion to seal (DE 130), and defendants' motion to seal (DE 131) are GRANTED. Filings lodged at DE 128, DE 129, and DE 129-1 are SEALED. Redacted versions of plaintiff's response brief and statement of material facts are lodged at DE 125 and DE 126, respectively. The clerk is DIRECTED to close this case.

SO ORDERED, this the 16th day of August, 2021.

_____
LOUISE W. FLANAGAN
United States District Judge